Rosella SNEED, Plaintiff-Respondent,

v.

John Ollie GOLDSMITH, Defendant-Appellant.

No. 7889.

Springfield Court of Appeals.

Missouri.

Jan. 19, 1961.

Riddle, Baker & O'Herin, Veryl L. Riddle, Charles H. Baker, Edward F. O'Herin, Malden, for appellant.

Arnold & Trammell, Dexter, for respondent.

McDOWELL, Judge.

The defendant has appealed from a $4,-000 judgment in a personal injury action in favor of plaintiff. The errors complained of relate to the damages awarded and particularly to the introduction of expert testimony given by Dr. Richard Comeau in plaintiff's behalf. We need not dwell on facts except as relate to such expert testimony.

Plaintiff offered evidence that on the morning of December 4, 1958, while a passenger in a Buick automobile, owned and driven by her husband, she was involved in a collision on Highway No. 62 in New Madrid County, between said Buick car and a GM pickup truck, driven by defendant. She stated the accident occurred on the north side of the highway while her husband was attempting to pass the truck; that the truck turned directly in front of the Buick car while attempting to make a left turn into an intersecting highway; that the Buick hit the pickup truck in the rear causing the Buick to spin around, head back west and come to rest on the south shoulder of the highway. She testified that as a result of the collision she received a hit on her head, cuts on her forehead and

face and a bruise under her right eye; that she was bleeding all over. She stated her right leg was hit and bruised from the hip down; that she received a hole in her right knee and lost quite a bit of blood.

Plaintiff was then taken to the Kennett Memorial Hospital where she was treated by Dr. Chester R. Peck. She testified that when she arrived at the hospital she was in such physical condition and so sick that she could not describe all of her symptoms and injuries; that she remained in the hospital a day and night and returned for further treatment on several occasions; that Dr. Peck treated her about three weeks. She testified at the time of the collision she was about four months pregnant; that she did not tell Dr. Peck she was pregnant. She gave this testimony:

"Q. And did you experience any pain around your abdomen or your stomach at the time of the accident and immediately thereafter? A. Yes. I had pain continually after that.

"Q. Now, the pain, you say, persisted for some time? A. Yes, sir."

She stated she miscarried February 12, 1959, in Doctor's Hospital in Poplar Bluff; that Comeau was treating her at the time. She gave this evidence.

"Q. Did you experience or suffer any pain in your abdomen or in that area from the time of the—from the date of the collision until this operation or miscarriage? A. Yes, sir, quite a bit."

She complained of pain in the lower part of her back, which ran all the way up her spine into her neck and her right leg continually pained her and had no feeling in it. She testified:

"Q. Now, then, I believe I forgot to ask you what was your condition, what was the condition of your health before this collision? A. I was in very good health."

She stated she had not seen a doctor since her last baby was born some four

years ago; that she was able to do all her housework prior to the collision.

On cross-examination plaintiff testified:

"Q. Did you tell Dr. Peck that you were pregnant? A. No, sir.

"Q. Did you tell him about your pain and discomfort around your stomach? A. Yes, sir.

"Q. When did you first start having trouble with your child? A. Immediately after the accident.

"Q. And what kind of trouble were you having then? A. Well, pains, and terrible pains in my back and stomach, and then shortly after I started the other troubles.

"Q. What do you mean other troubles? A. I started losing it.

"Did you bleed vaginally for a while before you lost the baby? A. Yes.

"Q. How soon after the accident did you begin to bleed vaginally? A. Well, I'd say about three weeks.

"Q. Did you lose any blood, did you pass any blood during the time that you were pregnant, I mean during this period of time immediately following the accident? A. Yes.

"Q. Was that bothering you then while you were seeing Dr. Peck? A. Yes.

"Q. You know what I mean when I say vaginal bleeding, don't you? A. Yes.

"Q. Did you report the vaginal bleeding to Dr. Peck? A. Well, I told him my—I tried to explain to him my troubles, and he told me at the time or he told my husband that I was in such a condition and swollen and all he couldn't examine me.

"Q. Now, then, did your bleeding increase at some particular time immediately following the accident or did it

stay fairly constant? A. No, it increased as it went along."

Plaintiff testified she had been married about fourteen years and had two children; that she had never had any trouble during her former pregnancies.

She introduced medical testimony of Drs. Peck and Comeau. Dr. Peck testified that he first saw plaintiff at approximately 11:30, December 4th; that he examined her and found that she was conscious, had a small cut over the right eye about an inch in length, a blood clot under the right eye, had a bruise of the ribs on the left and a small cut and bruise on the right knee; that she remained in the hospital until about 4:00 o'clock, December 5th. He testified that she returned for treatments December 9th, 18th, and 23rd; that he prescribed sedatives because of pain in her knee and headache; that he gave her penicillin to prevent infection. He testified he examined her on each of the other visits to his office, found her condition about as it was before, but that she had some infection of the right knee. He stated he did not examine her for pregnancy and that she did not tell him she was pregnant; that on the last visit the patient was still complaining of backache; that there was infection in the knee; that he took x-rays, which he did not have at the trial, which did not disclose any fractures of the knee or of the skull. He testified he had not seen the patient since December 23rd. He testified:

"Q. Did she at that time complain of any discomfort or pain in her stomach? A. Yes. Immediately after the accident there was some soreness in the lower part of her abdomen, she did complain of that."

Dr. Richard Comeau of Dexter, Missouri, testified on behalf of plaintiff, that he first saw her December 29, 1958, at his office in Dexter; that her chief complaints at the time were of pain in the lower region of her back, headaches, dizziness, nausea, and that her menstruations were irregular. The doctor testified at the time he examined plaintiff she was a middle-aged heavy woman with a facial expression of pain and that she was very nervous. He stated that because of the nervousness he had to make a limited examination; that he noted bruises on her face, on the right side and on the right leg, thigh and right knee. He testified that he examined the patient's back and found nothing wrong with the dorsal spine; that an examination of the lumbar spine and over the fourth and fifth spinous processes they were able to provoke some rather sharp pain; that at the time the patient complained of pain radiating from her right thigh and leg. He stated he took x-rays which did not reveal any fractures or dislocations. After enumerating many tests given the patient, the doctor gave this evidence:

"Q. What does that indicate? A. It indicates there is an injury or compression somewhere along the spinal cord."

The doctor testified that on his examinations he found there was some process pressing on the spinal cord. He stated that he gave the patient tranquilizers to quiet her down.

The doctor's evidence was that from tests made he found patient was about four months pregnant and bleeding; that she kept on bleeding, sometimes it would slow down, would stop, and then after a day or two would continue and he informed the patient there was a possibility she would miscarry. He later stated he advised her to go to the hospital where she miscarried.

On cross-examination the doctor gave this testimony:

"Q. Now, Doctor, on this question of the abortion, in your experience have you seen or treated a patient who aborted some three months and five days after a trauma? A. To be exact, yes. I have a case that happened just, oh— I'll have to look up the date, but it hasn't been more than a year or so ago. This patient was involved in a car

accident, was pregnant, and later had to be taken to Sikeston some several months after and aborted, and she bled intermittently somewhat similar to this lady. That is a concrete example and happened in a car accident, also.

"Q. Isn't it a little unusual in medical experiences for a person to abort that long after an accident? A. It's not—I'll admit that, it's not the natural procedure, but what happened is this: The lady was bleeding, wasn't aborting after the accident in this case. In Mrs. Sneed's case the sudden jar could loosen the placenta enough to make her bleed, and if we could control the bleeding, which we did at times—."

He testified that it is not the common thing to abort that long after the accident. He said "you have to worry that a sudden sharp jar like that will loosen the placenta". He said when that happens in the vast number of cases the abortion appears within a period of 10 or 12 days. He admitted there might have been intervening factors which caused Mrs. Sneed to abort. He gave this evidence:

"Q. Doctor, as a matter of fact, abortions are caused from many different things, aren't they? A. Correct, correct."

He gave it as his opinion that plaintiff had a ruptured disc in the lumbar spine.

Plaintiff's theory of the case was, and is, that she sustained injuries in the automobile collision which caused her miscarriage with its attending resultant suffering and disabilities. To establish this causal connection plaintiff propounded to Dr. Richard Comeau, who had attended her in her ailments following the collision, a hypothetical question, to-wit:

"Doctor, assuming that this plaintiff was well preceding December 4th, 1958, and that on that date she was in an automobile accident and that she afterwards complained of pain in her upper spine, cervical spine, and in her lumbar spine when she was examined by you on December 29th, and thereafter, and you found that she suffered from pain in those regions, and also she complained of receiving a blow or a hit to her ribs and to her stomach, and you found that she had been hit or received those blows to her ribs and her stomach, are you able to say, Doctor, coupling these premises with your examinations which you have already testified, are you able to say with reasonable certainty whether such injuries were competent producing causes of the abortion?"

A number of objections were made on the part of defendant to this question. First, it was objected to that the crucial fact is based upon a complaint rather than an assumed fact; secondly, that it included a number of unrelated matters, injuries to other parts of the body that would have no bearing on the issue and is too broad. Defendant's counsel made this objection:

"Well, my objections are principally to the things that haven't been included—I mean to some things that have been included that I think were erroneously included, and also there are some matters that should be included, such as her previous condition, such as any other concurring factors that may have lent or added to this condition, which could have been any one of a dozen other things that could cause a person to abort some two months and ten days afterwards, none of those facts have been assumed in this question, Your Honor, and further there is nothing in the nature of the injuries to the abdomen and the type of blow received, if any, to the abdomen."

Pursuant to this objection by the defendant the court made the following ruling: "It's understood that the question is amended by leaving out the reference to blows and hits and referring only to pain in those regions. Now, can you answer the question, Doctor?"

Defendant renewed his objection, as stated before, and the doctor answered: "My opinion is that the miscarriage was caused as a result of the accident."

Under allegation of error numbered II, appellant states: "The court erred in permitting respondent's doctor to testify, in response to the hypothetical question of respondent's counsel that the miscarriage suffered by respondent was the result of injuries received in the accident."

It was contended under this alleged error, first, that the question was not proper for the reason that a hypothetical question must contain all material facts, and, secondly, that the question propounded by respondent's counsel omitted the essential fact of the nature of respondent's injuries and is therefore erroneous. It is further contended that the hypothetical question must not assume facts not in evidence. That the question in issue assumed facts of respondent receiving blows to her stomach.

We here consider appellant's first alleged error, to-wit, that the hypothetical question must contain all material facts and that the question propounded omitted the essential facts of the nature of respondent's injuries and is therefore erroneous.

To support this contention appellant relies upon Lang v. St. Louis-San Francisco Railway Company, 364 Mo. 1147, 273 S.W. 2d 270.

In this case it was contended that the hypothetical question omitted a material undisputed fact in evidence, to-wit, the fact that Mr. Lang walked with a limp. The court stated this law on page 277 [8, 9] of 273 S.W.2d:

"* * * But assuming that it was established as a 'fact' from evidence introduced by the plaintiff, it does not follow that the court's refusal to compel its inclusion in the hypothetical questions constitutes prejudicial error. * * * While hypothetical questions must be proper in both form and content and contain all material

facts relating to the subject matter, the trial court has some discretion as *too* what must be included, 32 C.J.S., Evidence, § 551b(1), p. 350, and the omission of some fact or facts and the mere violation of the general rules does not always constitute such prejudicial error as to demand the granting of a new trial."

De Donato v. Wells, 328 Mo. 448, 41 S. W.2d 184, 82 A.L.R. 1331, is relied upon by appellant to sustain this alleged error.

The facts in this case related to hypothetical questions propounded to three doctors who treated plaintiff a few hours after her injury when the automobile in which she was riding was struck by the rear approach of a street car. The question considered was whether plaintiff's miscarriage was caused by violence or trauma inflicted on her in the collision which occurred more than three months prior thereto. The medical testimony given in the case was conflicting on the issue. The hypothetical questions propounded to the doctors after setting out the collision and injuries received by the plaintiff contained this statement: "I want you to assume all of those facts, and eliminating any other cause." The court stated:

"* * * The chief value of expert evidence lies in the fact that the witness possesses superior knowledge of the subject under consideration, and by reason of his study, training, and experience he is able to discern and trace the causal connection, if any, between successive events, and can aid the jury in determining whether the claimed injury is the result of the alleged cause or may have a different cause. Certainly the witness should be left free in the exercise of all his faculties in so doing, and should not be told to exclude matters which may be important. * * *"

The court held that it is proper for a medical expert to testify and give his opinion either from facts within his own knowledge and observation or from hypothetical

facts or from the two combined. Where the witness has personal knowledge or observation a hypothetical presentation is unnecessary. The court stated that it would seem obvious where the witness' opinion is based on and supported by his personal observation and knowledge, it is more likely to be correct than when the facts are merely hypothetical. The court made this statement:

"Moreover, a hypothetical question should include all the facts essential to the theory of the party propounding it, and 'undisputed facts, when material, must always be assumed.'"

32 C.J.S. Evidence § 551 b, pages 350, 356, is cited by appellant. On page 350 this law is stated:

"The form of hypothetical questions and the facts to be embraced therein are matters resting largely in the sound discretion of the trial court; but the right and duty of properly framing a hypothetical question rests primarily on the counsel by whom the question is asked, and he should not be permitted to frame an improper question and then cast the burden of supplying its deficiencies on the opposing counsel, * *. The question may and should be so framed as to reflect the theory of the party propounding it, as shown by the facts admitted or proved, and must confine the opinion given to the likely or probable result of the combination or circumstances assumed."

On pages 352, 353, the author states: "While considerable latitude must be allowed a party in the choice of facts constituting the basis of a hypothetical question, the question should place before the witness sufficient facts to enable him to give a judgment which will be of value to the jury."

In 20 Am.Jur., Evidence, § 793, pp. 665, 666, this law is stated:

"The rule requiring the statement of hypothetical facts to an expert witness has no application to questions calling for the conclusion of one who has personal knowledge of the subject of the inquiry. If the witness called upon to give expert testimony is acquainted with the facts of the case—that is, if he has personal knowledge or has made personal observation—he may give his opinion upon the basis of his knowledge and observation in response to direct interrogation, provided he is shown to have sufficient knowledge of the facts to enable him to form an opinion entitled to be given weight by the jury and, according to the weight of authority, provided the witness first testifies to the facts in his own knowledge upon which his opinion is based. * * * Even in such cases he may give his opinion based on hypothetical facts alone or upon such facts together with facts within his own knowledge."

In Hunter v. St. Louis Southwestern Railway Company, Mo.Sup., 315 S.W.2d 689, the court considered an objection to a hypothetical question on the ground that it failed to include all the material facts in evidence. The court made this statement on page 696:

"* * * We have recently said, 'it is not absolutely essential that a hypothetical question should include all material facts supported by evidence. The questioner may frame his hypothetical question on his own theory and may not necessarily include all of the material facts shown in evidence. The questioner may elicit an opinion on any combination or set of facts he may choose, if the question propounded fairly hypothesizes facts the evidence tends to prove and fairly presents the questioner's theory so that the answer will be of assistance to the jury on the issue.' Huffman v. Terminal R. Ass'n of St. Louis, Mo.Sup., 281 S.W.2d 863, 870."

It will be noted in the instant case that Dr. Richard Comeau attended plaintiff and treated her, starting December 29, 1958,

some 25 days after the collision. He testified, without objection, that when he first examined plaintiff he asked what her chief complaints were at that time and stated that she was complaining of pain in the lower region of her back, headaches, dizziness, nausea; that his examination revealed that she was a middle-aged woman, with facial expression of pain, and very nervous; that he noted the bruises on her face, right side on the leg, thigh of the right leg and right knee and stated that palpation of the patient's cervical spine provoked tenderness in the region of the spine and that his examination provoked severe pain in her neck and she complained of pain in the lower region of her back. He testified that he examined the lumbar spine over the fourth and fifth spinous processes and was able to provoke some rather sharp pain; that he gave the patient a tranquilizer and took a whole series of x-rays of the skull and cervical spine, dorsal spine, lumbar spine, which revealed no fractures or dislocations; that due to the patient's severe pain and her irregular menstruations he gave her microthermy treatment and fitted her with a sacroiliac belt. He testified that his examination indicated the patient had an injury along the spinal cord. On further examination, he testified that he found the patient was about four months pregnant and bleeding and that he prescribed medication and treatment; that she kept on bleeding and at times it would slow down and stop but after a day or two it would continue; that he advised the patient there was a possibility she would miscarry. Later, the doctor testified he had the patient put in a hospital in Popular Bluff where she miscarried.

■ Under the law the questioner may frame his hypothetical question on his own theory and may not include all the material facts in evidence. He may elicit an opinion on any combination or set of facts he may choose, if the question propounded fairly hypothesizes facts the evidence tends to prove and fairly presents the questioner's theory so that the answer will be of assist-

ance to the jury on the issue. Huffman v. Terminal R. Ass'n of St. Louis, Mo.Sup., 281 S.W.2d 863, 870, and authorities cited therein. Under this authority our Supreme Court laid down the law that the questioner need not cover in his hypothesis the entire body of the testimony put forward on the point by him or his opponent, citing Vol. II, Wigmore on Evidence, 3d Ed., § 682, p. 807.

■ We do not agree with appellant's first contention.

In Hunter v. St. Louis Southwestern Railway Company, supra, 315 S.W.2d at page 696, the Supreme Court, in the last opinion we have found on this subject, decided September 8, 1958, stated:

"We have recently said, 'it is not absolutely essential that a hypothetical question should include all material facts supported by evidence. The questioner may frame his hypothetical question on his own theory and may not necessarily include all of the material facts shown in evidence. The questioner may elicit an opinion on any combination or set of facts he may choose, if the question propounded fairly hypothesizes facts the evidence tends to prove and fairly presents the questioner's theory so that the answer will be of assistance to the jury on the issue."

We, likewise, do not agree with the second contention under this alleged error, to-wit, that the question propounded omitted essential facts of the nature of respondent's injuries.

■ Following the law as laid down in De Donato v. Wells, supra, that it is proper for a medical expert to testify and give his opinion, either from facts within his own knowledge and observation or from hypothetical facts or from the two combined, we think the testimony of Dr. Comeau, combined with the evidence offered as set out in the hypothetical question in issue, entitles the questioner to elicit the

352

opinion as to the cause of the abortion. We think the attending doctor had sufficient knowledge of the essential facts obtained from his examination and treatment of plaintiff after the accident as to make his opinion proper. It was stated by our Supreme Court that where the witness has personal knowledge or has made personal observation a hypothetical presentation is unnecessary. However, the court stated that it would seem obvious where the witness' opinion is supported by personal observation and knowledge, it is more likely to be correct than where the facts are merely hypothetical.

We hold that the form of the hypothetical question in issue and the facts embraced therein were matters in the sound discretion of the trial court; that the question so framed did properly present the theory of the plaintiff and that the decision of the trial court should be affirmed.

The last objection leveled against the hypothetical question in issue is that it assumed facts not in evidence, specifically calling attention to blows to plaintiff's stomach.

It will be noted that the trial court modified the question by striking out "blows and hits" and said that the question would relate only to pain in those regions. The evidence by Dr. Peck is that the witness did complain at the time he first examined her, a few hours after the accident, of pains in her abdomen and stomach, and Dr. Comeau testified that he found plaintiff was pregnant and bleeding. We think this and the other testimony of Dr. Comeau, coupled with plaintiff's testimony, fully supports the assumed facts in the question.

We agree with the law stated in Bunch v. Wagner, Mo.App., 275 S.W.2d 753, 757 [6], declared by this court, which held that hypothetical questions not predicated upon the testimony which assumes that facts existed that the evidence did not show was error.

In Schrader v. Kessler, Mo.Sup., 178 S.W.2d 355, 358 [4], the court stated: "* * * as a rule a hypothetical question, propounded on direct examination, must be based upon facts proved, or which the evidence tends to prove. Vol. II, Wigmore on Evidence, 3d Ed., § 672, pp. 792–5."

The law is well settled in Missouri that hypothetical questions should be predicated on the evidence. Stipp v. Tsutomi Karasawa, Mo.Sup., 318 S.W.2d 172, 174 [1, 2].

The law, as declared in the authorities cited by appellant, is properly stated but we do not agree with appellant's contention that the question assumed facts of respondent receiving blows to her stomach, which was not in evidence. The trial court, specifically, took that part of the question out.

Judgment affirmed.

STONE, P. J., and RUARK, J., concur.